WR-80,923-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/21/2015 12:31:21 PM
Accepted 4/21/2015 1:11:20 PM
ABEL ACOSTA
CLERK

# EXHIBIT D

# Transcript on Motion for Disclosure of Trial Files

REPORTER'S RECORD

VOLUME 3 OF _____ VOLUMES

TRIAL COURT CAUSE NO. W-F09-00409-Y

|  |  |
|---|---|
| | ) IN THE CRIMINAL DISTRICT |
| | ) |
| EX PARTE RODERICK HARRIS | ) COURT NUMBER 7 OF |
| | ) |
| | ) DALLAS COUNTY, TEXAS |

_____

MOTION FOR DISCLOSURE

_____

On the 26th day of March, 2015, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Elizabeth D. Frizell, Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

VEARNEAS W. FAGGETT, TEXAS CSR #3129

Official Court Reporter

Criminal District Court No. 7

214.739.3906

A P P E A R A N C E S

MS. SHELLY O'BRIEN YEATTS
SBOT NO. 24033487
MS. REBECCA OTT
SBOT NO. 24074842
MS. JACLYN O'CONNOR LAMBERT
SBOT NO.  24049262
Assistant District Attorneys
HONORABLE SUSAN HAWK
CRIMINAL DISTRICT ATTORNEY OF DALLAS COUNTY
133 North Riverfront Boulevard
Dallas, Texas  75207
Telephone:  214.653.3600
Attorneys for State of Texas


MR. ROBERT ROMIG
SBOT NO. 24060317
MR. JEREMY SCHEPERS
SBOT NO. 24084578
MR. BRAD D. LEVENSON
SBOT NO. 24073411
OFFICE OF CAPITAL WRITS
1700 N. Congress Ave., Ste. 460
Austin, Texas  78711
Telephone:  512.463.8522
Attorneys for Defendant

INDEX

MARCH 26, 2015                                      PAGE VOL

Proceedings ...................................     5    3

Defense Motion for Access to DA file withdrawn.    6    3

State Motion for Access to Dr. Reed's report ..    6    3

State Motion for Roderick Harris Trial Files ..   23    3

Reporter's Certificate ........................   42    3

E X H I B I T    I N D E X

(No exhibits were offered or admitted in this volume)

P R O C E E D I N G S

(March 26, 2015)

THE COURT:  We are on the record in Ex Parte Roderick Harris, Cause Number W-09-00409, and State's attorneys and Defense attorneys are here.  If you all would just go from my right to your left and state your names.

MS. YEATTS:  Shelly Yeatts for the State, Your Honor.

MS. OTT:  Rebecca Ott for the State.

MS. LAMBERT:  Jaclyn Lambert for the State.

MR. LEVENSON:  Brad Levenson from the Office of Capital Writs.

MR. ROMIG:  Robert Romig from the Office of Capital Writs.

MR. SCHEPERS:  Jeremy Schepers, Office of Capital Writs.

THE COURT:  Okay.  And I have two motions to consider today.  State's Motion for Disclosure of Roderick Harris' trial files as well as the State's Motion for Access to Dr. Christine Reed's psychological evaluation.  And, State, you may proceed.

MS. YEATTS:  Your Honor, for the record, also the Office of Capital Writs previously had a motion

pending for access to the District Attorney's trial file, and counsel came earlier this week and did review the District Attorney's trial file. So, we'd ask for the record -- they had indicated that they wish to withdraw that motion and ask for them to do that now, Your Honor.

MR. SCHEPERS: That's correct. We're happy to withdraw that motion, Your Honor.

THE COURT: Okay. That motion is withdrawn. And any other matters we need to take up before we start?

MS. YEATTS: No, ma'am.

THE COURT: You may proceed.

MS. YEATTS: So, first, can we talk about the motion for State's access to Dr. Reed's -- Dr. Christine Reed's report.

THE COURT: Yes.

MS. YEATTS: What happened at trial, Judge, is that defendant had experts who went in and evaluated him prior to trial. One of those experts was Dr. Toni McGarrahan. She conducted a psychological evaluation of the defendant in October of 2011. This trial was May of 2012.

The State's position, Your Honor, is that the defendant's speaking to his own experts prior to trial triggers the Lagrone case and triggers the State to have

its ability to use its examination of the defendant at trial as rebuttal.

Prior to trial the State filed a motion under Lagrone for access to the defendant because of his limited Fifth Amendment waiver prior to trial by speaking to his own experts.

The judge at the time, Judge Snipes, granted that motion. So the State's expert that we have hired for trial is Dr. Christine Reed, and she went in and evaluated the defendant prior to trial.

Under the Court's order, that evaluation was then sealed, and the State did not have access to it. With the intent being if the defendant called experts during trial that he had spoken to or that had evaluated him, the State would have received a copy of Dr. Reed's report. That did not happen. So the State has never had access to her report.

In this writ, however, Your Honor, Mr. Harris has relied on the evaluation that Dr. McGarrahan his own expert did prior to trial, and that was a psychological examination.

What happened here is that several of the claims in this writ rely on Dr. McGarrahan's testing and rely on her evaluation. The counsel for Office of Capital Writs has used another psychologist,

Dr. Underhill to take her raw data and generate scores based on that raw data, and Dr. Underhill's scoring of the psychological testing has been utilized and relied on in numerous pending claims. And that includes -- there's several claims of ineffective assistance of counsel based on failure to investigate and present certain evidence in this writ, Your Honor.

One of those claims is a fetal alcohol syndrome claim. The allegations are that trial counsel should have investigated and raised and presented evidence of fetal alcohol syndrome at trial.

Two of their experts, one psychologist, Dr. Brown and a M.D. Dr. Davies, Dr. Davies' evaluation was just done in December of last year and provided to the State and the Court. Both of those experts are relying on the psychological testing done prior to trial.

Also, there's a toxicologist. The issue there is the possible lead exposure in west Dallas. The toxicologist also relies on the psychological evaluation that was done prior to trial.

Other experts rely on that information assuming that there's some type of neurological deficits based on the psychological evaluation. Dr. Robinson who does the schools-to-prison pipeline theory, in testimony she's relying on the assumption that there's neurological

damage based on the psychological done prior to trial and Laura Sovine who was a social worker, she also relies on these conclusions.

So we know at this point what Dr. McGarrahan's testing was because Dr. Underhill made a list of those tests and the results. We know that Dr. McGarrahan's testing include an IQ test and also general academic testing, that includes like reading, writing, and math.

I don't know, Your Honor, what Dr. Reed's evaluation shows because that's been sealed and never provided to the State. I don't know what testing she did. She was the State's expert at trial. She was our consultant, but she -- in the court order, she did not reveal the results of her testing.

So I am in a position, Your Honor, that I had an expert at trial and I now have an expert on my writ who is Dr. Christine Reed, but I don't have access to the evaluation she did of the defendant.

So, interestingly, Your Honor, when I called her, I called her and said I don't have a copy of your report, of course, because it was sealed and I'll have to get permission from the Judge to access that report. She indicated that Mr. Romig also was interested in having her report, and he had previously called her during his investigation and asked for the report; and she told him

that she couldn't provide it to him because it was sealed.

So the point, Judge, is that the defendant's Fifth Amendment waiver and speaking to his experts and then relying on that communication in their writ triggers an examination by the State and triggers the State having access to the examination that was previously done by his own expert.

The State believes that what the Office of Capital Writs wishes to do at this point is narrow our rebuttal. I believe their position from the communication -- of course, they can explain that to you -- I believe their position is that they want to use Dr. McGarrahan's evaluation now only as to the neuropsychological deficits.

So it seems like they're putting the cart before the horse which is a place we've been previously when we've been in front of you, Judge. Because I feel like they want to narrow the scope of the State's rebuttal based on relevancy.

But the State's position is they're coming in and they're saying counsel is ineffective because their client had these deficits and these deficits are based on this mental health condition. And they want the State to be limited to talking about the mental health condition

that's identified by their experts.

But the State's position is this is rebuttal and that we can look at the deficits, and those deficits were all talked about at trial. I'm talking about ADHD, learning problems, things of that nature.

So the State's position is that we can look at the cause of those deficits. We can look at the etiology of those deficits and we can bring our own experts and explain on our own terms what caused those deficits, what could be the basis of them. We don't think we're limited by their expert's scope and their expert's framing of those issues.

I think I'll close at that point with an opportunity for rebuttal, Judge.

THE COURT: Okay. Response from the Defense.

MR. ROMIG: Thank you, Your Honor. At the start I should mention just for the record that our client Mr. Harris is not in court today and that's with our understanding.

At the outset I'd say on this issue we don't disagree in large measure with what the State just said. There's a lot -- by putting into issue during our writ Mr. Harris' neurological deficits, we've certainly opened up the opportunity for the State to rebut that issue.

Where we disagree with the State is exactly in the limitations of what they're allowed to rebut. It's not so much our request to limit them, but it's what the case law says in Lagrone and Soria from the Court of Criminal Appeals about exactly how broad that waiver of Fifth Amendment protections has been.

I have a couple cases to give, Your Honor, that were cited in the State's brief (tendering).

THE COURT: Thank you.

MR. ROMIG: And I have flagged relevant portions. What the Court of Criminal Appeals has said is that when a defendant initiates and uses a psychiatric examination and presents psychiatric testimony, the defendant then may be compelled to undergo an examination from the State's expert, and the State may present rebuttal testimony of that expert based upon his examination of the defendant. But the Court of Criminal Appeals specifically says that the rebuttal testimony is limited to the issues raised by the Defense expert.

So to give an example, Your Honor, just because Defense expert cardiovascular surgeon goes in and examines the defendant doesn't mean now the State can choose any type of expert witness they want to go in and speak to the defendant and ask him about any issue he wants because obviously --

THE COURT: Do you think that's what the State is doing here?

MR. ROMIG: No, not exactly, Your Honor. The problem in this case is that Dr. McGarrahan a Defense expert at trial is a neuropsychologist but also does general psychological evaluations. And so in this case she was one expert that did multiple, different types of examinations of the defendant.

She did personality testing. She did a general mental health examination, and she did specific neurological examinations that utilized a specific battery of tests that only neuropsychologists do.

It's those neuropsychological testings that are the basis of our fetal alcohol syndrome claim. The basis of the deficits for which the application is speaking about.

Now it may be that Dr. Reed did neuropsychological testing. We are also in the dark as far as what Dr. Reed did as the State mentioned. In our investigation, we discovered that Dr. Reed had done an evaluation but that it was sealed under Lagrone. So I think it's entirely appropriate for, Your Honor, to get the report and find out what was done.

What we're saying is not appropriate is if Dr. Reed merely did a general psychological evaluation

that was aimed at looking at things like schizophrenia, major mental health diagnoses, that's not what we're talking about in the application. What we're talking about is neuropsychological deficits. If Dr. Reed didn't do neuropsychological testing, it's not apples and apples; it's apples and oranges.

And you'll actually see in the third case that we've given you that the State cites is the Davis case. In that case at trial there was a distinction made between the types of experts you can use. The Defense had a psychiatrist evaluate the defendant, and the trial court said, okay, State, you can have a psychiatrist. You cannot have a psychologist. And that was an appropriate limitation.

So in this case all we're saying is that, Your Honor, needs to look at Dr. Reed's report and look at what testing she actually conducted. And, if it's not neuropsychological testing, that's just simply not the issue that's been brought up by the application so it's not appropriate to disclose.

THE COURT: Okay. And Dr. Reed's report, where is that? I wasn't the judge when she testified.

MS. YEATTS: It's sealed. She would have provided a copy to Judge Snipes under seal and he would have reviewed it.

THE COURT: Where would Judge Snipes have put it?

MS. YEATTS: We can certainly ask her to provide a sealed copy to you now, Judge.

THE COURT: That would be great.

MS. YEATTS: But I'd like to address some of those items, if I may.

THE COURT: Okay. Were you finished, counselor?

MR. ROMIG: For the moment, yes.

THE COURT: Okay. You may respond.

MS. YEATTS: The way the Court of Criminal Appeals has narrowed the Lagrone cases and the cases that follow, is that it's mental health expert and mental health expert. It's not narrowed beyond that.

Dr. Reed is a forensic and clinical psychologist, and Dr. McGarrahan is a neuropsychologist. I imagine -- without having seen Dr. Reed's report, I don't know, but I imagine there's a lot of crossover in those types of evaluations.

Counsel is splitting hairs by saying -- he can't pick the State's expert, Your Honor. And my position would be that when we present the evidence and when we present the testimony, anything that my expert has to say would go to weight and not admissibility.

He's trying to upfront bar me from using this witness, and I don't think that's appropriate, Your Honor.

I think that the Davis case supports the State's position. In the Davis case, the trial court did elect to limit the psychologist's examination because the psychiatrist had not done any testing. So in that case the trial court decided that the State wouldn't bring a psychologist to do testing. They would just bring in a parallel psychiatrist.

Your Honor, that case otherwise supports the State's position of the expansion of Lagrone, and that wasn't the issue before the Court of Criminal Appeals. That was already something that had been decided by the trial court, and they're moving beyond that.

Also, Judge, in the Ward case that I cited in my brief, the issue was a social worker testifying about mitigation who had relied on other evaluations done by other individuals. And the Court there decided that the State could have its own psychiatric expert come in and evaluate the defendant when the social worker who took the stand relied on third party psychiatric evaluations.

So there the Court's focus in these cases, Your Honor, the cases that follow Lagrone is on the defendant's choice to break his silence, and the Court of Criminal Appeals has said they are not going to do hair

splitting on these issues on whose testimony whose evaluations are allowed.

Also, Judge, you know this is a writ hearing. We don't have a jury in the box. And my position would be that my rebuttal would be allowed broadly so that I can bring in different experts.

If his expert wants to say that the ADHD and the other characteristics that he exhibited throughout life were based on alcohol fetal syndrome, I can be bringing experts that say these deficits were based on something else. They have a different etiology.

So I don't have a jury in the box, Judge. This is part of what you are deciding in this writ. He claims that trial counsel should have brought in this expert, and I can show the Court, if trial counsel had brought in that expert, this is the one or two or three or four experts I may have brought in at rebuttal at trial or the State would have brought in at rebuttal at trial.

And then part of your decision in this writ, Judge, is to decide whether that's relevant and whether that would have been admitted at trial. And until you hear that testimony from the witness stand, you shouldn't be asked to make that decision upfront now and preclude that evidence from coming in later. That's part of your decision on the writ.

So we would submit our findings. You would make those decisions on whether that evidence would have been admitted or not. There's no reason to decide that now and to preclude the State from putting on a portion of its case this early in the game, Your Honor.

THE COURT: Okay. Let me hear the Defense's response.

MR. ROMIG: So just a couple of points on that, Your Honor. I would say, first, I don't think the State's description of the Lagrone cases and the case law is exactly accurate. I don't think the CCA has gone so far as to say mental health evidence is mental health evidence and it's all the same.

What they have instead focused on is the evaluation that is performed. Absolutely, the Defense has no right and we are not trying to suggest which expert does or does not get to evaluate on behalf of the State. We have no problems with Dr. Reed as an expert witness. It's that did she do the equivalent type testing. We're not even saying she has to do the same --

THE COURT: Well, I mean, it does kind of boil down to that. What was she testing and how would we know that unless I have --

MR. ROMIG: Exactly. You need to get the report. That's our point. You need to get the report

and look at it and see is what she is doing is looking at actual cognitive deficits. Because that's the underlying data that we're going to be focusing on in the writ hearing is cognitive impairments, not other sort of psychological issues like psychosis. That's not part of our focus.

THE COURT: But I need you to also address the State's point. If he's saying, oh, my counsel was ineffective. He should have brought this expert up.

MR. ROMIG: Exactly, Your Honor.

THE COURT: And that's a technical decision on what to bring up. And they are saying, yeah, and if you had, guess what I would have brought up. So is it ineffective or is it strategically deciding what to bring --

MR. ROMIG: That's why I think it's a little bit of a red herring on the part of the State to say let's focus on what could the State have in speculation presented had they been back in that situation.

THE COURT: How would they know that unless we allow them to view --

MR. ROMIG: The writ hearing is about counsel's performance, not the State's performance.

THE COURT: Right. But, if you are trying

to evaluate whether counsel performed inadequately, wouldn't that be a part of it? They should have called that person or maybe they should not have because in turn three, four, five, six things would have been brought up.

MR. ROMIG: The problem with evaluating that way, Your Honor, is it doesn't actually look at counsel's performance. It starts to look at the end game. It starts to look at what might the State have done, and we don't know what the State would have done.

And, in fact, by the time trial happens, we should be evaluating the trial counsel's performance on what they did pretrial. Whether the State brought forward another expert, at that point their performance is done. Trial counsel's performance has been complete. If we're going to be evaluating trial counsel's performance, we need to be looking at only what information they would have had at the time they're doing their investigation and creating the case.

THE COURT: They, meaning Defense counsel?

MR. ROMIG: Defense counsel. They wouldn't have had the defense of the State's expert's report. They wouldn't have known necessarily what experts the State were planning on utilizing.

THE COURT: So am I understanding this correctly? Judge Snipes sealed this from both sides?

Defense has not reviewed it; State has not reviewed it?

MS. YEATTS: Correct, Your Honor.

THE COURT: Okay.

MR. ROMIG: All we are asking, Your Honor, is please review it and make sure it's actually equivalent data.

THE COURT: You're saying how would trial counsel know because they didn't --

MR. ROMIG: They would have never received it until after trial is going on.

THE COURT: All right. I'll take a look at that.

MS. YEATTS: I am aware that Pat Kurlin communicates extensively with Defense counsel during this trial, and I imagine he has told Defense counsel, given them some indication of whether he would be calling Dr. Reed depending on what they did. Those things are often negotiated as a part of strategy.

And also just to remind you that we're also -- the case law governs this, but we're also looking at the economy of this issue. We hired this expert and paid her. She did an evaluation. He has waived his Fifth Amendment privileges.

Do I want to bring in another expert and do my evaluation from scratch? I don't know, Your Honor. But

there is an economy piece to this.

THE COURT: Okay. All right. Anything else on that issue?

MS. YEATTS: No.

THE COURT: All right. Let's go to the State's Motion for Disclosure of Roderick Harris' trial files.

MS. YEATTS: There is one other brief thing on that, Your Honor.

We would ask in conjunction with our motion that Dr. McGarrahan's raw data be provided to our expert to prepare for our writ hearing.

THE COURT: Okay. Any objections from the Defense?

MR. ROMIG: I'm sorry which expert?

THE COURT: Dr. McGarrahan's.

MS. YEATTS: Dr. McGarrahan's raw data.

MR. ROMIG: Provided to Dr. Reed?

MS. YEATTS: To Dr. Reed. Your Honor, the raw data usually does not go through counsel. Usually -- often at trial there's an agreement between counsel, and the psychologists contact each other and exchange that raw data.

THE COURT: Do you all object to that?

MR. SCHEPERS: At the very least, Your

Honor, we would think that if that sort of scenario is what is occurring that our experts need to have Dr. Reed's raw data as well if you make the determination to release that report.

THE COURT:  Okay.  Any objections from the State?

MS. YEATTS:  If the report is released, the State does not object to an exchange of raw data including Dr. Reed.

MR. SCHEPERS:  If the report is released, the exchange is fine with us.

THE COURT:  All right.  Anything else?

MS. YEATTS:  Not on that issue.

THE COURT:  All right.  Let's go to State's Motion for Disclosure of Roderick Harris' trial file.

MS. YEATTS:  Okay.  Your Honor, as we said the bulk of this writ, I think five out of six claims, are ineffective assistance of trial counsel, and those ineffective assistance claims go to failure to investigate and failure to present certain evidence.

The State's position is that Mr. Harris' trial file documents their investigation.  The trial file documents the performance and the preparation, the investigation made to prepare for trial.

We are aware in past cases that the Office of Capital Writs normally scans trial counsel's file. It's been their practice in other cases in this building or three other cases where they agreed to provide the State with the trial file.

In two of those cases, the trial file was provided on disks. In one case -- of course, I am talking about portions of the file that are relevant to the ineffective assistance claims, Your Honor. I should have said that upfront.

In one case they provided portions of the file designating what they didn't think was relevant to the claims. In the third case, they agreed to provide the file and then counsel was substituted.

So, the State's position is that the Court of Criminal Appeals has held in the McCann case, which the Office of Capital Writs is very familiar with because they were involved in this case, the Court of Criminal Appeals held that the trial file belongs to the defendant. The trial files belong to the individual.

So, based on our discussions, our understanding and based on the response that the Office of Capital Writs has filed, is that they acknowledge that Mr. Harris has entered into a limited waiver to attorney-client and work-product privilege information in his file. That the

issue has become what do we do based on that waiver.

The State believes that the McCann case clearly says on Page 3 and on Page 9 that the file belongs to the client. I think what the Office of Capital Writs is proposing based on an answer they filed last week is that it's up to trial counsel what the scope of this waiver is and what to provide.

And the State is opposed to that position because they represent the client. The file belongs to him. They're in possession of the file. Trial counsel turned over the original copy of the file to them. And as of Tuesday, trial counsel didn't have a copy. I don't know if a copy has been provided to trial counsel since Tuesday.

The State believes that putting trial counsel in a position of evaluating the ineffective assistance claims and determining the scope of that waiver and trial counsel determining what to turn over to the State puts that duty in the wrong place.

I don't believe it's practical, Your Honor. We think this is governed by Texas Rule of Evidence 503(C) and (D)3 that says the privilege belongs to the client. The privilege belongs to Mr. Harris. When he's waived it, we feel like they have a duty to review the file, determine what relates to the ineffective assistance

claims and provide that to the State.

And, Your Honor, the State believes that these -- much of the claims that are made in this writ were based on and rely heavily on the original review of the trial file. So we believe it brings the file specifically into issue and that likely involves a fair volume of materials.

THE COURT: Let me be clear. What part of the file are you requesting, all of it?

MS. YEATTS: Anything that relates to the ineffective assistance claims and those claims cover --

THE COURT: It could be all of it.

MS. YEATTS: It could be all of it, Your Honor. Those claims cover the mitigation case and those claims cover objections that were or were not made in the guilt innocence phase, and those claims cover the pretrial investigation. So the State cannot imagine much that might be in the file that would not relate to those claims.

THE COURT: I'll give the Defense a chance to respond. I don't think their argument is that the file doesn't belong to the client. I don't think. It's how extensive is it. Is it opening up the entire file. Anyway, let me let you finish then I'll hear their response.

MS. YEATTS: Well, the problem is that they want to make the claims of ineffective assistance, but they don't want to provide the evidence that they have in their hand that relate to those claims. And to put the burden on trial counsel, on Brad Lollar, on Doug Parks, on the other attorneys -- first of all, there are four attorneys and -- so you are talking about four people looking at the file, looking at the scope of the waiver, deciding what may or may not be involved in claims that Mr. Harris has raised. They don't -- the terms -- the claims are framed by Mr. Harris. And, to put that burden on the Defense attorneys, the State believes is improper.

Also, Your Honor, there's a chilling effect to those attorneys being willing to provide portions of a file that doesn't belong to them, and there's a chilling effect because they may be in fear that if they make a mistake, if they analyze Mr. Harris' claims wrong, they could be liable for a grievance. So there's a chilling effect to them putting this on the trial attorneys' lap to undertake this burden.

THE COURT: You're saying what motivation do they have to say, yeah, you're right. I messed up. Here you go. Or, no, I didn't. Here you go. Because then doesn't it affect you when you are in trial? Should

I put this in my file because later it's discoverable. See, that's kind of the principle behind it because you have a free flow of information with the defendant.

MS. YEATTS: That's part of the chilling effect. The chilling effect I'm talking about is they're worried that if they provide something that they should have kept privileged that they will be grieved, and that they'll be grieved by Mr. Harris who filed these ineffective assistance claims.

THE COURT: I can understand that. Was that it on that point, because I know you have more? But I want to take it a point at a time and let them respond and then you can go on to the next one, unless you're not finished.

MS. YEATTS: They can go ahead, Your Honor.

THE COURT: Okay. Defense's response.

MR. SCHEPERS: Thank you, Your Honor. First, we certainly recognize and agree with the State that by having raised claims of ineffective assistance of counsel here we've created a limited waiver of otherwise privileged information. I think the State's assessment of our position is pretty close to spot-on where we stand.

The State thinks because we've raised

ineffective assistance of counsel claims that then they're automatically entitled to view trial counsel's files. It's our position that trial counsel is the party that should determine what information is relevant and necessary to be revealed to this Court to defend themselves against those IAC claims.

There are three brief points that I'd like to highlight on that, and then I will respond to a couple of the State's arguments.

The first point that I'd like to make is that nowhere in the State's motion is there any binding authority for the idea that the State is now entitled to access to trial counsel's files. What these cases stand for, the Texas cases and many of the ABA opinions as well, is that trial counsel once an IAC claim is raised is then permitted to defend themselves with otherwise privileged information.

The second point that I'd like to highlight is that I think the State's request for such broad discovery in this case in a lot of ways is really a breath-taking proposition in my opinion in a criminal case. In very few scenarios is a defendant in a criminal case ever required to provide discovery to the State.

Now there certainly are some scenarios, for example, if competency is being litigated, the defendant

would have to turn over relevant medical records. The defendant would also have to provide limited discovery regarding experts that they want to put on at trial.

But I think the discovery in those cases is significantly smaller than what the State asked for here. And, perhaps, more importantly there's a specific statute, case law and evidentiary rule that specifically requires that and in this case that just simply doesn't exist.

The third point I would like to make is that in an IAC writ, the State does not represent trial counsel. Now almost certainly they'll be arguing that trial counsel performed effectively, but they're not trial counsel's representatives in this matter. And we don't think it's appropriate for them to substitute their judgment in for what trial counsel should be making determinations of what information is relevant and necessary.

And in response to the State's argument, I would like to point out, Your Honor, we have just this morning actually we met with two of Mr. Harris' trial counsel and we've told them that we'll provide for them copies of the file for their review. So they will have access to those materials both to prepare themselves for court and also to determine which of those materials are

necessary to put into the fact-finding process during their testimony in the May hearing.

The second point that I would like to make is regarding the chilling effect that the State is talking about. The first thing I would like to point out is that I think a far greater chilling effect than the possibility of -- than trial counsel having to look and see what's in their file to determine what to release, is a Court such as yourself ordering that their entire trial file or to the extent that it's relevant and necessary is automatically turned over to the State. I think that would have a significantly larger chilling effect a court order going into place rather than trial counsel themselves sitting down and determining how they need to defend themselves against those IAC claims.

I also would like to point out -- I think there was some suggestion that there would be the possibility of fear of reprisal from the Office of Capital Writs based on the material that is turned over.

In the four and a half years that our office has existed, we've never filed a bar grievance against an attorney for turning over materials. And to be honest, Your Honor, I can't come up with a scenario in my head right now where that would be appropriate. I certainly can't make a blanket statement, but I can't come up with

any scenario off the top of my head right now or filing a bar grievance or something along those lines would be the appropriate remedy.

So, our position is basically -- we're asking you certainly to deny the State's motion and then keep the power where the case law supports that it should be, with trial counsel, to determine which of this information needs to be turned over.

THE COURT: Have any portions of the file been turned over to the State at this point?

MR. SCHEPERS: They have not, Your Honor.

THE COURT: Okay. So, before the State argues open up the whole file, why not look at -- depending on how I rule, why not look at what's provided and see if that's sufficient first before you make the argument that maybe more is needed.

MS. YEATTS: I would be happy for the Court to order the Office of Capital Writs to provide what they think is relevant to an ineffective assistance claim and to provide a privileged log and then I could -- you know, Your Honor could view the privileged log and the Court could also and if there's something on the privileged log that you think we should have access to we would challenge it at that point.

THE COURT: I'm sorry. I cut you off. I'm

going to come back to you. You weren't finished yet.  Did you have anything else you wanted to say?

MR. SCHEPERS:  I do now.  Just to be clear, we're objecting to turning over any materials to the State but I was finished.  Thank you, Your Honor.

THE COURT:  Okay.  You may respond.

MS. YEATTS:  Your Honor, one thing that counsel referenced in a cite in a brief is the American Bar Formal Opinion 10-456.  I would point out to the Court that is an advisory opinion.  The American Bar Association and its advisory opinions are not binding on the Court.

Also, the problem is that the American Bar Association opinion does not take into account the McCann case which says that the trial file belongs to the client, belongs to Mr. Harris.  And I'm not sure with the McCann case in existence that it would not be problematic for trial counsel to turn over anything, anything hard copy from the file.

I think there's a practical piece to this, too, Your Honor.  If we wait until trial counsel is on the stand and then we bring up the subject and then we determine that something they're talking about is documented in the file and that needs to be part of these proceedings, we'll be doing that piecemeal and we'll be

slowing down the hearing and we may be wasting the Court and the parties time.

In this instance the American Bar opinion talks about that trial file should be provided only under court supervision, and I think that's where we are, Your Honor. We are in the phase of court supervision. And in the instance of these writs, of course, the writ is filed with evidence attached; the affidavits of the experts, the affidavits of the family members, the people who have something to say about the writ claims.

In the past, Your Honor, the State's response would include affidavits by the trial attorneys addressing those writ claims. So, at the phase we're at now, we would have normally in the past already have had trial attorneys' testimony in the record. Because the Office of Capital Writs in the past has asked us not to speak to the trial attorneys until after the Order Designating Issues is entered, which we have done in this case, we don't have evidence from the trial attorneys but we could, Your Honor.

We could have evidence from the trial attorneys in the form of affidavits which even under the American Bar Association opinions would then allow the Court to order those attorneys to provide portions of their records that relate to these claims.

So the State's position is there's no sense to wait until the hearing. That pushes things off. The State's position is that really the purpose of opposing this motion is to put the State at a disadvantage to prepare for this hearing.

THE COURT: The hearing is scheduled for May?

MS. YEATTS: Yes, ma'am.

THE COURT: I will make the decision well before May, I promise you.

Anything else from the Defense?

MR. SCHEPERS: Your Honor, we would just like to add in that we don't think the State's reference to McCann here is particularly relevant in light of the fact that trial counsel does have access to these files. Certainly, we agree with the proposition in McCann which we think is essentially always been the law. It was clarified, stated in McCann, that the file belongs to the client.

I think the biggest point that I would like you to take away from this is just what a huge step the State is asking here for in a criminal case, just massive amounts of discovery without any case law, without any statute, without an evidentiary rule; and we believe that this power should be left for trial counsel to determine

how they need to defend themselves and not to let the State substitute their own opinion in there.

THE COURT: There will definitely be a lot of material.

Anything else from the State?

MS. YEATTS: Just, Your Honor, that I think the McCann case is on point. It puts trial counsel in a bind. We think that the Office of Capital Writs has the duty and obligation here to review the file and determine what's relevant. That's all, Your Honor.

MR. LEVENSON: Counsel -- may I add something?

THE COURT: Yes, you may.

MR. LEVENSON: Of the -- if this court was -- two things: If this court was going to rule for the State, one, we would less likely take a mandamus up to the Court of Criminal Appeals. So that might delay -- depending on how long the court took. Because there is again no law or statute that talks about this type of discovery.

Second, the issue of electronic versus paper. The State has asked for electronic copy of our files. At one point we were negotiating with the State and we said to them, if you will supply an electronic version, we would consider continuing to supply an electronic

version.

The State would not give us an electronic version. They made their files available to review. If this court was going to determine that the State should have access to the files, at most the State should come to Austin and review the same way that we reviewed their files on paper without the electronic version. It certainly makes it easier for the State to have an electronic version but there's no --

THE COURT: Okay. Any objections to that from the State, if I were to rule that way?

MS. YEATTS: The State doesn't have a problem with reviewing the hard copies of the file, Your Honor. The issue with our file, we don't provide an electronic copy because we don't have one, and we have to provide the manpower and pay to have our files scanned. We believe the Office of Capital Writs already has this on disks which they should have already and may be providing to trial counsel.

THE COURT: You're saying that would be an easier way to do it?

MS. YEATTS: It is, Your Honor. The State believes that the reason they don't want to provide an electronic copy is they don't want the State to offer that into evidence which has been done in the past. And

we think that the file should be offered into evidence to document what the Office of Capital Writs had in developing their writ claim.

THE COURT: Okay.

MS. YEATTS: So we would ask for an electronic copy, Your Honor. And also when they came to review our file earlier this week, they tagged items they wanted copies of. I provided those to them. There was nothing that they asked for a copy of that I didn't provide.

THE COURT: Defense.

MR. LEVENSON: We would do the same thing for them, if they came to Austin. If we were not going to object to the Court's ruling, if the Court went that way, we would make copies available to them. Also, we do scan the files for our benefit, the benefit of us. We don't do it for the use of the State later on.

THE COURT: But help me understand. She's saying they don't have theirs in an electronic version; you do. So is it to make it more burdensome upon them or what would be the purpose -- if you have it both ways, what would be the purpose of having them come in for the physical files as opposed to electronic?

MR. LEVENSON: They can. I mean it cost money and manpower for us to scan our files and we do it

so we can review them.  We have an easier way of documenting them.

THE COURT:  Like I'm trying to make it easier for me, not easier for you, right?  Is that the --

MR. LEVENSON:  We scan them for our benefit.  We're not scanning them for the State.  The State could spend manpower and money to scan their files like we do, because they know that we would like to see their files as well.

THE COURT:  I understand. Okay.  Anything else from the State?

MS. YEATTS:  That's all, Your Honor.

THE COURT:  All right.  Anything else from the Defense?

MR. LEVENSON:  No, Your Honor.

THE COURT:  Okay.  Dr. Reed's report, who can get in contact with Dr. Reed?

MS. YEATTS:  I can, Your Honor.

THE COURT:  Okay.  Let me review that, and then I'll give you a ruling on both of these motions; and I will do that well before the hearing in May so then both sides will know and can prepare accordingly.

MR. ROMIG:  Your Honor, I guess I would just add one thing on Dr. Reed.

THE COURT:  Yes.

MR. ROMIG: Again, we object to it being disclosed, if it's not relevant. If you do disclose it, we would also like to have a copy, if possible.

THE COURT: Okay. All right. Any objections to them having a copy, if I do disclose it?

MS. YEATTS: We will be getting copies of all of their doctor's reports.

THE COURT: I thought the issue was Dr. Reed. That was the main issue. That's the only report I'm reviewing.

MS. YEATTS: Although I did ask for raw data from Dr. McGarrahan's report.

THE COURT: Okay. And if I were to rule that this report is going to be unsealed, I think we have an agreement that there will be an exchange of raw data so I understand that.

MS. YEATTS: I don't object to them receiving a copy of Dr. Reed's report, Your Honor. I expect that to be part of their litigation.

THE COURT: Very good. Both sides trying to be fair. I love it. I love it. So I will review that and I'll have my court coordinator get in contact with you all. You don't have to come back down here for my ruling unless you just want to make a trip to Dallas. I can email it to you. We'll get that to you in some

form so that you know.

Okay.  Anything else I need to cover for the record?

MR. LEVENSON:  No, Your Honor.

THE COURT:  All right.  That's all for the record.

(End of the proceedings)

-o-0-o-

STATE OF TEXAS          &

COUNTY OF DALLAS        &


    I, Vearneas W. Faggett, Official Court Reporter in and for the Criminal District Court No. 7 of Dallas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

    I further certify that the total cost for the preparation of this Reporter's Record is $ _____ and will be paid by _____.

        WITNESS MY OFFICIAL HAND this the 21st day of April, A.D., 2015.

/s/Vearneas W. Faggett
VEARNEAS W. FAGGETT, CSR# 3129
Official Court Reporter
Criminal District Court No. 7
Dallas County, Texas
133 N. Riverfront Blvd.
Dallas, Texas  75207
Telephone:  972.739.3906
Expiration:  12/31/2015

D I S C L O S U R E

Note:   Supreme Court Rule Adopted and Promulgated in Conformity with Chapter 52 of the Government Code, V.T.C.A

Please be advised that pursuant to Supreme Court Rule IV, B.5., with regards to disclosure, I, to the best of my knowledge, have no existing or past financial, business, professional, family or social relationships with any of the parties or their attorneys which might reasonably create an appearance of partiality, except as follows:  NONE.

/s/Vearneas W. Faggett
VEARNEAS W. FAGGETT, CSR #3129
Expiration:  12/31/15
Criminal District Court No. 7
Frank Crowley Criminal Courts Bldg.
133 N. Riverfront Blvd.
Dallas, Tx  75207